## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TYRONE GILL, N10443,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **DR. SIDDIQUI,** | ) | |
| **DR. COE,** | ) | |
| **N.P. MOLDENHAUER,** | ) | **Case No. 19-cv-1101-DWD** |
| **WARDEN LASHBROOK,** | ) | |
| **WARDEN KINK,** | ) | |
| **WARDEN BROOKHART,** | ) | |
| **DR. AHMED,** | ) | |
| **S. STOVER,** | ) | |
| **DR. PITTMAN,** | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Tyrone Gill, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Menard Correctional Center (Menard), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Menard and Lawrence Correctional Centers.  Plaintiff alleges the defendants were deliberately indifferent to his chronic neck and back pain, and to a right shoulder injury sustained in March of 2017.  The Defendants' filed timely Motions for Summary Judgment (Docs. 99, 101, 104, 106), Plaintiff responded (Doc. 111, 112, 113, and 114), and two groups of Defendants replied (Docs. 115, 116).  The matter is now ripe for review.  As explained in this Order, summary judgment will be granted in favor of Dr. Ahmed (Doc. 98), Drs. Coe and Caldwell (Doc. 106), Wexford Health Sources, Inc. (Docs. 104, 106), and

Warden Kink (Doc. 101).  By contrast, summary judgment will be denied to Dr. Siddiqui (with relation to Plaintiff's rotator cuff tear and neck), Dr. Pittman (with regard to Plaintiff's chronic neck problems), Moldenhauer (with relation to Plaintiff's rotator cuff tear and neck), Stover (with relation to Plaintiff's chronic neck problems), Lashbrook (with relation to Plaintiff's rotator cuff tear and neck), and Brookhart (with relation to Plaintiff's chronic neck problems).

## PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on October 9, 2019.  (Doc. 1).  Upon initial review, the Court identified two valid claims to proceed in the instant case:

Claim 1:     Eighth Amendment claim against Siddiqui, Moldenhauer, Caldwell, Lashbrook, Coe and Wexford for deliberate indifference to a serious medical need while at Menard;

Claim 2:     Eighth Amendment claim against Kink, Brookhart, Ahmed, Pittman, Stove S. and Wexford for deliberate indifference to a serious medical need while at Lawrence.

(Doc. 11 at 5).[1]  The defendants eventually withdrew the affirmative defense of failure to exhaust administrative remedies, and this case proceeded to merits discovery in November of 2021.  (Doc. 69).  Plaintiff moved for the appointment of counsel to assist him with this matter, and his request was granted.  Once counsel appeared on Plaintiff's behalf, discovery deadlines were thrice extended to allow the parties sufficient time to accomplish discovery and depositions.  (Docs. 90, 93, 96).

---

[1] A third claim concerning medical care at Big Muddy Correctional Center was severed into a separate case, but Plaintiff opted not to proceed in that matter.  *See Gill v. Larson, et al.*, Case No. 20-cv-280-NJR (S.D. Ill. March 24, 2020) (plaintiff informed the Court he did not wish to proceed on the severed case by filing a motion to dismiss).

<u>FACTS</u>

This case involves extensive medical care provided over the course of three years at multiple different prisons, and by numerous providers and outside specialists.[2]  Rather than recount the entirety of Plaintiff's care here, the Court will discuss the facts of treatment in detail as relevant to the individual defendants and claims in the analysis.  For now, it is sufficient to give a broad overview.  Defendants Lashbrook, Moldenhauer, and Drs. Siddiqui, Coe and Caldwell interacted with Plaintiff during his time at Menard.  Defendants Kink, Brookhart, S. Stover, and Drs. Pittman and Ahmed interacted with Plaintiff at Lawrence.  Wexford Health Sources, Inc. is the corporate medical contractor for both facilities.

Plaintiff first sought treatment for low back pain and neck pain between 2014 and 2016 at Stateville Correctional Center.  While at Stateville, Plaintiff had an MRI, and he also had injections in his back.  On September 27, 2016, Plaintiff was transferred from Stateville to Menard, where he continued to seek care for his existing injuries.

On March 6, 2017, Plaintiff sustained injuries to his right shoulder and his head during a fight with another inmate.  During his stay at Menard, Plaintiff was treated for

---

[2] The parties' submissions of medical records and factual statements were difficult to navigate in this case. Most of the medical records were not in chronological order, and each party submitted their own random collection of the records.  The affidavits were also prepared in a manner that seemed self-serving and that excluded some of the care that appears pertinent.  The Court thoroughly reviewed the exhibits submitted by each party and created a chart of appointments, providers, and types of care, to best analyze what occurred in this case.  Despite this extensive exercise in charting and mapping the records, it is still possible the Court overlooked a visit or course of physical therapy.  It is also important to note that both in the medical records and in the affidavits, the parties seemed to discuss the same medical conditions by different terms.  For example, Plaintiff's chronic neck pain was sometimes referred to simply as neck pain, and then other times it was referred to as a cervical spine issue.  *See e.g.*, Doc. 113-2 at 113-115 (January 9, 2018, specialist visit notes discuss chronic neck pain and injections, and then turn to recommending "cervical spine" physical therapy).

(or sought treatment for) his low back pain[3], his neck or cervical spine pain[4], and his right shoulder injury.  In the spring of 2018, he also reported new mid-back pain at Menard, and efforts began to identify and treat this new ailment.  While various courses of diagnosis and treatment were ongoing, Plaintiff was transferred to Lawrence on October 4, 2018.  Plaintiff continued to seek care for his low back, mid-back[5], neck, and shoulder the whole time he was at Lawrence.  Plaintiff was transferred from Lawrence to Big Muddy on July 8, 2019.

Throughout his time in Menard and Lawrence, Plaintiff received MRIs of his neck, mid-back, low back, and right shoulder.  He was seen by specialists at multiple hospitals, and repeatedly by the SIH Brain and Spine Institute.  On May 1, 2017, the Brain and Spine Institute recommended conservative care for Plaintiff's neck in the form of injections and physical therapy for the neck.  In October of 2017, he received two injections for his neck pain.  In January of 2018, Plaintiff returned to the Brain and Spine Institute concerning ongoing neck problems, and it was recommended he try neck specific physical therapy and that he return in six weeks if he still had pain.  In April of 2018, he received an injection for his right shoulder, and he was recommended to try physical therapy and to return as needed.  While at Menard, Plaintiff was never sent to Brain and Spine to follow-up for his neck after the January 2018 appointment, and he was never sent back to the orthopedic specialist to follow-up about his shoulder after the April 2018 injection.

---

[3] This is also referred to in the record as lumbar or dorsal back pain.
[4] This is also referred to in the record as Plaintiff's C-spine and spinal stenosis is discussed with this area of Plaintiff's back.
[5] This is also referred to in the record as Plaintiff's thoracic or T-spine.

Plaintiff continued to seek care for his back, neck and shoulder pain at Lawrence. When he was initially put in to return to the specialists at Brain and Spine in mid-November of 2018, Wexford insisted he first try an alternative treatment plan of six weeks of physical therapy for his neck.  Eventually in March of 2019, he had a new MRI for his neck, at the request of the Brain and Spine Institute.  Dr. Pittman reviewed the results in May of 2019 and concluded that in her opinion, Plaintiff's injuries were not severe, but she never succeeded at securing the previously sought follow-up at Brain and Spine, despite some notations in the record that it was supposed to occur.  Plaintiff left Lawrence without ever seeing the specialists to follow-up for his injuries.

In October of 2019 (while at Big Muddy River), Plaintiff was finally seen again by the neurology group concerning his ongoing neck problems.  It was recommended that he attempt additional injections, and also that he might do better with a longer acting NSAID such as Meloxicam.  (Doc. 99-1 at 61).  Ultimately, on November 18, 2019, the neurology group indicated that they had consulted in conference about Plaintiff's situation and that they did not identify a surgical pathology or intervention at that time. (Doc. 99-1 at 63).

The evidence submitted by the parties includes, Plaintiff's medical records, grievance documentation and letters to prison officials, and affidavits from Defendants Dr. Siddiqui, Moldenhauer, Dr. Coe, Dr. Pittman, and S. Stover.[6]  There is also deposition

---

[6] None of the affidavits are signed, so the Defendants are DIRECTED to submit signed copies in seven days.

testimony from Plaintiff, Wardens Lashbrook and Brookhart, and Glen Babich (a regional medical director for Wexford).

Dr. Glen Babich testified in broad terms about Wexford's management of care, and a bit about Plaintiff's conditions. He testified that generally when a request for outside care is presented in collegial review, it can take about a week to a week and a half for the collegial review and the resulting decision to be returned. (Babich Dep., Doc. 113-8 at 18:24-19:5). After approval, the scheduling is done by a medical furlough clerk (an IDOC employee) and is dependent on the availability offered by the outside providers. (*Id.* at 26:7-27:16). After an appointment with a specialist, an inmate is to be seen back at the prison by a provider within five days to review the specialist's findings and to make any needed follow-up recommendations. (*Id.* at 35:13-16). If the test results or visit notes are not back yet, it may take longer to implement recommendations. (*Id.* at 5:16-20). Dr. Babich estimated that at most, it can take about three weeks to get records back from a specialist. (*Id.*). Wexford only learns of a specialist's recommendation for external follow-up care if the doctor or provider at the prison recommends that the follow-up care be implemented and sends a request through collegial review for the care. (*Id.* at 52:7-16).

Dr. Babich testified that Wexford is not contacted directly about grievances, and he is not aware if Wexford staff at the prison are contacted about grievances on medical issues. (Babich Dep., Doc. 113-8 at 53:9-54:1; 54:14-55:2). Dr. Babich testified that he believed the potential lack of communication between the grievance procedure and the treating medical staff is a "blind spot," that might prevent medical staff from being informed that an inmate is seeking follow-up care. (*Id.* at 56:13-57:9).

6

Concerning Plaintiff's ongoing care, Dr. Babich testified that Plaintiff will continue with a course of conservative care for all of his chronic injuries, unless a periodic evaluation suggests another course of action.  (Babich Dep., Doc. 113-8 at 74-79).  As to the neck or back issues, therapy and medication are the best options.  (*Id.*).  The change that might warrant surgery would be a pinched nerve, but otherwise, Plaintiff is not currently a good surgical candidate.  (*Id.* at 74:10-14).  Absent a pinched nerve, therapy and pain medications are the best options to mitigate the sort of chronic pain Plaintiff has and to reduce his incidence of "degeneration" or arthritis.  (*Id.* at 75:1-9).  Dr. Babich also opined that it is generally not possible to eliminate all pain in the context of chronic pain, because it is tied to nerve damage, which often cannot be remedied or eliminated.  (*Id.* at 75:10-19).  Specifically, as to the torn rotator cuff, Dr. Babich testified that a greater tear down the road could warrant surgery, but the present tear does not warrant surgery.  (*Id.* at 76:14-18).

## CONCLUSIONS OF LAW

A.  Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).  Courts generally cannot resolve factual disputes on a motion for summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is

not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750; *accord, Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord, Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm") (internal quotation marks omitted) (emphasis added). Additionally, an injury need not have been specifically diagnosed to have demanded action by a medical professional. *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015). "An official may not escape liability by 'refusing to verify underlying facts that she strongly suspects to be true.'" *Id.*

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly

or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something

more than negligence or even malpractice is required" to prove deliberate indifference.

*Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct,

not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (*citing Gayton*,

*593 F.3d at 620*).

> The Seventh Circuit discussed the subjective state of mind in depth in *Zaya v. Sood*,
>
> We have consistently held that neither a difference of opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate indifference. See, e.g., Petties v. Carter, No. 14–2674, ––– F.3d ––––, ––––, 2016 WL 4631679, slip op. at 8 (7th Cir. Aug. 25, 2016) (en banc); Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006); Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). However, we have also made clear that an inmate need not show that he was "literally ignored" to prevail on a deliberate-indifference claim. Conley v. Birch, 796 F.3d 742, 748 (7th Cir. 2015) (quoting Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000)). A doctor who provides some treatment may still be held liable if he possessed a sufficiently culpable mental state. See Petties, ––– F.3d at ––––, 2016 WL 4631679, slip op. at 12.
>
> [...]
>
> A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist. See Petties, ––– F.3d at ––––, 2016 WL 4631679, slip op. at 9; Gil v. Reed, 381 F.3d 649, 663–64 (7th Cir. 2004); Jones v. Simek, 193 F.3d 485, 490–91 (7th Cir. 1999). The validity of the inference rests primarily on the contemporaneity of the communication and the defendant's decision. Instructions from a specialist are evidence that the defendant knew a particular course of treatment was recommended by at least one other medical professional at the time the defendant chose not to provide that treatment.

836 F.3d 800, 805-06. The *Zaya* Court went on to find that a doctor was not deliberately

indifferent for departing from a specialist's recommendation when he justified that

departure based on his own wealth of experience treating fractures and he believed the

course he selected was reasonable in light of his extensive personal experience treating patients. *Id.* By contrast, in *Jones v. Simek*, 193 F.3d 485, 490-91 (7th Cir. 1999), the Seventh Circuit found that where there were disputes about whether a doctor followed medical judgment in delaying referral to a specialist, the claim against the doctor should survive summary judgment.

The Seventh Circuit has noted a subclass of deliberate indifference cases where an inmate does not claim that his medical issue was ignored, and instead argues that he received constitutionally deficient care for an injury or condition. *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). These cases are best described as "a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.*, *citing Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 2008). The standard, "reflects the reality that there is no single 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field. *Lockett*, 937 F.3d at 1023 (internal citation omitted). "State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice or standards that a jury may reasonably infer that the decision was not based on professional judgment. " *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016). A choice to pursue an easier or less effective course of treatment, or a non-trivial delay in treating serious pain may also support a claim of deliberate indifference. *Lockett*, 937 F.3d at 1023.

In addition to refusing treatment or providing treatment that is inadequate, a prison medical provider may also be liable for deliberate indifference based on allegations that they needlessly delayed treatment. To demonstrate that a delay caused a cognizable injury, an inmate must show that the delay either exacerbated his injury *or* that it unnecessarily prolonged the pain. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021). In cases where prison officials delayed rather than denied treatment, the plaintiff must offer verifying medical evidence that the delay (rather than the underlying condition) caused some degree of harm. *Id.* at 749, *citing Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

When it comes to chronic pain or long-term injuries, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain free." *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023), *citing Arnett v. Webster*, 658 F.3d 742, 753-54 (7th Cir. 2011) and *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). However, evidence that defendants persisted in a course of care known to be ineffective, ignored the recommendations of specialists, or selected a course of care far afield from accepted professional standards, might be sufficient to survive summary judgment and to create a dispute of fact for a jury. *Id.* "A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016). But, if a doctor has a reasonable explanation for choosing an alternative course from what a specialist recommends that meets professional standards, then the doctor's alternative choice may not amount to deliberate indifference. *Wilson v.*

*Adams*, 901 F.3d 816, 822 (7th Cir. 2018) (finding that a doctor was not deliberately indifferent when he explained that he thought it was reasonable to continue with conservative care despite a specialist's suggestion the plaintiff could be seen by a pulmonologist for a follow-up).

## B. Analysis

The Court notes that the findings in this Order are very nuanced and case specific and were fueled in part by the fact that neither party submitted true independent expert testimony nor reports on any of the care rendered.  In a deliberate indifference case at summary judgment, expert testimony or evidence is common and is one of the best forms of evidence to tip the scales in favor of either party.  Perhaps the Wexford providers intended for Dr. Babich's testimony to take the role of an expert because it seems he was designated or contemplated as Wexford's corporate representative in this case, but Dr. Babich's testimony was relatively generic in relation to Plaintiff's own situation, and not much foundation was laid for his professional experience or qualification to opine on the specific medical conditions that Plaintiff possesses and the care he received.  At Dr. Babich's deposition, there was very little discussion of the nuanced day-to-day care rendered in this case.  As such, Dr. Babich's testimony was not particularly useful in determining whether the care provided for Plaintiff's multiple chronic conditions was within the bounds of reasonable medical judgment.

### i.    Objectively serious medical condition

Dr. Pittman and Sarah Stover are the only providers who argue explicitly in their summary judgment brief that Plaintiff did not have a serious medical condition. (Docs.

104, 105).  They seem to premise this argument on Dr. Pittman's opinion of the March 2019 follow-up MRI films, from which she surmised that Plaintiff had mild degenerative changes and cervical stenosis for which there was no total cure.  (Doc. 105 at 12).  The Court is unwilling to adopt the view, based on this single instance of imaging, that Plaintiff's chronic conditions fell short of serious.  Plaintiff alleged over the years that he sought treatment that his pain was severe and at times debilitating—preventing him from ambulating easily and sometimes amounting to temporary paralysis from pain.  The existence of a potential remedy for the chronic pain does not diminish the fact that it was a serious condition for Plaintiff that impacted his daily functioning.  Additionally, while Dr. Pittman opined that very conservative care was appropriate, she also was awaiting a follow-up review by Plaintiff's specialist's (the Brain and Spine Institute), and she never got that information while Plaintiff was at Lawrence.  Accordingly, the Court will treat Plaintiff's conditions as serious in the analysis for all defendants discussed individually below.

### ii.     Subjective intent of the medical providers

#### a.  Dr. Siddiqui

Out of all seven medical providers, the medical records demonstrate that Dr. Siddiqui had the most encounters with Plaintiff, and he treated him for all of his identified ailments—neck/C-spine pain, low back pain, T-spine or mid-back pain, and the shoulder injury.  Dr. Siddiqui first encountered Plaintiff in March of 2017 a few weeks after Plaintiff had injured his right shoulder in a fight and had been assessed at the hospital.  At that time, Dr. Siddiqui noted he did not yet have reports from the hospital for the right

shoulder pain.  (Doc. 107-1 at 13).  Dr. Siddiqui provided medication and Bengay for the shoulder, and also made a referral via collegial review for a neurosurgery consultation for the chronic neck pain.  The neurosurgery evaluation was approved within 2 days, and the appointment was scheduled for May 1, 2017.  (Doc. 107-1 at 14).

At the May 1 appointment, the specialist noted "no evidence of reflex changes no motor weakness and no signs of myelopathy on physical exam," so the specialist suggested conservative measures of physical therapy and injections.  (Doc. 107-1 at 24-25).  Dr. Siddiqui presented these recommendations in collegial review, and both were approved on June 9, 2017.  (Doc. 107-1 at 33-34).  On July 31, 2017, Dr. Siddiqui made a referral that Plaintiff attend a neurosurgery follow-up that was a pre-requisite to the injections, and this was approved.  Plaintiff was also scheduled for a physical therapy evaluation on July 25, 2017, though it is not clear from the records tendered by Dr. Siddiqui if Plaintiff attended this evaluation.[7]  (Doc. 1-7-1 at 20-21, 37).

Plaintiff had injections for his neck pain on October 2 and 17, 2017.  He subsequently reported to Dr. Siddiqui that the relief provided was only temporary, so Dr. Siddiqui noted on October 24, 2017, that he would be submitted to collegial review for his spinal stenosis.  (Doc. 107-1 at 39).  On November 16, 2017, Dr. Siddiqui noted that the spinal stenosis collegial review had been approved, and he also noted ongoing right shoulder pain, so he recommended a right shoulder MRI.  (Doc. 107-1 at 41).  Both

---

[7] The records tendered by the IDOC Defendants include exercises for neck pain from the July 25, 2017, consultation.  (Doc. 102-3 at 116-19).  Based on these records it appears that Plaintiff went out for the neck physical therapy evaluation suggested on May 1, 2017, by the specialist, but it is unclear that after this evaluation Plaintiff continued physical therapy at the prison specific to his neck in the summer or fall of 2017.

referrals were approved and on January 9, 2018, Plaintiff went back to the specialist concerning his neck, and for the MRI of his shoulder.  (Doc. 107-1 at 58, 61).  The specialist notes from January 9, 2018, indicate that Plaintiff was participating in physical therapy for his *low back*, but that he had not yet completed physical therapy for his neck—which was one of the two conservative measures initially recommended.  (Doc. 107-1 at 64).  The specialist recommended that Plaintiff attempt physical therapy for his cervical spine, to include traction if possible, and to return in approximately six weeks to determine if surgical intervention is appropriate.  (Doc. 107-1 at 66).

On January 23, 2018, Dr. Siddiqui saw Plaintiff for a follow-up, but had not yet received the reports on the right shoulder.  He noted "neurosurgery for c-spinal stenosis" and referred Plaintiff for a physical therapy evaluation for his right shoulder and neck.  (Doc. 113-2 at 61).  Dr. Siddiqui avers that on February 5, 2018, he "added orders for physical therapy to Plaintiff's cervical spine and surgery to treat cervical spinal stenosis."[8]  (Siddiqui Aff., Doc. 107-2 at 4 ¶ 13).  Medical records confirm these referrals.  (Doc. 113-2 at 62).  On February 22, 2018, Plaintiff reported to Defendant Moldenhauer that he was supposed to have surgery the day before, but the surgery did not occur.  (Doc. 113-2 at 63).  There is no further indication in the medical records or in Dr. Siddiqui's affidavit about what happened with this apparent surgical referral for the C-spine surgery that was noted on February 5, 2018.

---

[8] These notes by Dr. Siddiqui come just two days after Plaintiff sent a letter to Warden Lashbrook complaining that he had not yet been seen for follow-up care about his neck or shoulder after seeing the specialist in January of 2018.  The addition of physical therapy for the "cervical spine" is confusing, because the cervical spine and neck are the same, and Dr. Siddiqui had already referred a physical therapy evaluation for Plaintiff's neck on January 23, 2018.

Dr. Siddiqui saw Plaintiff on March 27, 2018,[9] at which time he finally had the shoulder MRI results that revealed a chronic tear and degeneration.  (Doc. 113-2 at 65).  Based on these results, he referred Plaintiff for an ortho consultation, which was approved.  There is no mention in the March visit notes of the chronic neck problems, or any follow-up on the January 9, 2018, recommendations from the specialist to complete neck physical therapy and to follow-up in six weeks.[10]

Plaintiff had an ortho consultation for his shoulder on April 18, 2018.  Dr. Siddiqui noted that he received an injection at the appointment, and it was recommended he continue physical therapy.  (Doc. 107-1 at 53).  Dr. Siddiqui indicated on April 23, 2018, that Plaintiff reported low back pain and that he had an MRI from 2016 which showed mild to moderate narrowing in areas of the spine.  (Doc. 107-1 at 42).  Dr. Siddiqui referred Plaintiff to physical therapy for the new complaints of low back pain and also ordered x-rays of the dorsal spine area.  (*Id.*).

The x-rays were taken a few days later, but two appointments to review them were rescheduled.  (Doc. 7-1 at 43-44).  Dr. Siddiqui did not see Plaintiff again until June 18, 2018, at which time he re-confirmed that in 2016 Plaintiff had low back epidural, but he did not otherwise comment on the x-rays of the dorsal spine.  (Doc. 113-2 at 59).  Instead,

---

[9] The MRI took place on January 9, 2018, and the prison apparently did not get the records until March 27, 2018, despite Plaintiff grieving the issue multiple times, and despite him seeing Dr. Siddiqui once and Moldenhauer twice in the interim.  Dr. Babich testified that at most, it usually took three weeks to get reports back from outside providers.

[10] Dr. Babich testified that Dr. Siddiqui must have made a personal judgment that a follow-up was not needed, and instead opted for continuing physical therapy.  (Babich Dep., Doc. 113-8 at 83:3-24).

Dr. Siddiqui noted new reports of mid-back pain, so he submitted Plaintiff for an MRI of his thoracic spine, and he referred him to physical therapy.  (Doc. 113-2 at 67).

On August 3, 2018, Dr. Siddiqui noted Plaintiff had chronic back pain with c-spinal stenosis, severe degenerative changes to the L-spine, degenerative changes to the T-spine and cervical radiculopathy.  (Doc. 107-1 at 55).  He indicated that Plaintiff "has collegial referral for neurology."  (*Id.*).  Dr. Siddiqui averred that on August 3, 2018, he placed a referral for Plaintiff to be seen by neurology, and when he saw Plaintiff again on August 25, 2018, he indicated that a neurology evaluation was pending.  There is no evidence in the medical records tendered by any party that this neurology referral was ever actually made in August of 2018 or transmitted to Wexford.  Dr. Siddiqui avers that on August 25 he informed Plaintiff that the referral for neurology was pending.  (Siddiqui Aff., Doc. 107-2 at ¶ 20).  Dr. Siddiqui avers that he saw Plaintiff a final time on September 25, 2018, at which time he renewed the referral for physical therapy and sought an update on the neurology appointment.  (Siddiqui Aff., Doc. 107-2 at 6 ¶¶ 19-20).

Dr. Siddiqui's course of care must be considered relative to each condition.  Dr. Siddiqui's early course of care for the chronic neck pain appears diligent, but over time that diligence seems to have either diminished or been lost in shuffle of managing multiple conditions.  Dr. Siddiqui initially fielded complaints of chronic neck pain and made a successful referral to a neurologist just over a month from their first visit.  On May 1, 2017, Plaintiff saw the specialist who recommended injections and physical therapy.  Once these recommendations were made, they were not implemented quickly.  Dr. Siddiqui submitted these recommendations to collegial review more than a month

after they were made on June 9, 2017, but the physical therapy evaluation did not occur until July 25, 2017, and Dr. Siddiqui did not make a referral for injection related appointments until July 31, 2017.  It is unclear why there was a delay of almost three months from the specialist visit until the implementation of the recommendations.

The injections then ultimately took place on October 2 and 17, 2017, and Dr. Siddiqui noted during a visit only a week later that the injections were not effective, and a surgical referral should be considered.  Plaintiff then went back to the specialist on January 9, 2018, at which time they noted he had not completed the suggested neck physical therapy.  They suggested that therapy be tried, and he be seen again in six weeks. Dr. Siddiqui appears to have received this information on January 23, 2018, because he ordered a neck physical therapy assessment, and then added assessments for the cervical spine on February 5, 2018—but it is not clear these referrals were seen through.  On March 1, 2018, a nurse practitioner again renewed the physical therapy referral.  Dr. Siddiqui saw Plaintiff in late-March 2018 and in June 2018, but made no comment during those visits on the neck/cervical spine.  It does not appear that Dr. Siddiqui ever followed through on the six-week follow-up to the January 9, 2018, visit.  The medical records contain notes from multiple encounters with nurses or nurse practitioners from January to October of 2018 when Plaintiff sought follow-up care or advice for his neck but received no change in the status quo of his care.

Most confusing, there are notes from February 5, 2018, signed by Dr. Siddiqui that appear to suggest he believed Plaintiff need "surgery for C-Spine stenosis."  Plaintiff tried to inquire about this with Moldenhauer on February 22, 2018, (one of the occasions when

he sought follow-up care for his neck), but it does not appear anything was done. (Doc. 113-2 at 62-63). There is also a one page note from Plaintiff's January 9, 2018, specialist visit that showed an appointment at the neurologist's office on February 21, 2018. (Doc. 113-2 at 80). Perhaps this was supposed to be the six-week follow-up on the neck issues, or a surgical consultation as hinted by Dr. Siddiqui's February 5, 2018, notes, but it seems this visit never occurred.

Against this backdrop of information, there is a genuine dispute of fact about whether Dr. Siddiqui's management of Plaintiff's care for his chronic neck pain amounted to an exercise of reasonable medical judgment, a negligent mistake, or deliberate indifference. While a prison doctor is not expected to mitigate or resolve all chronic pain, and while he is entitled to choose from a range of professionally acceptable courses of treatment, the Court cannot definitively say from the record what actually occurred in this case. Did Dr. Siddiqui get the notes from the January 9, 2018, neurologist visit and decide that physical therapy or alternative medications should be attempted for more than just six weeks?[11]  Did he intend to send Plaintiff for a surgery or follow-up visit in February of 2018?  Why was Plaintiff's neck pain essentially unaddressed from January or February of 2018 until August of 2018? And, in August of 2018, did Dr. Siddiqui really make a referral back to the neurologist that either did not go through or got lost in the

---

[11] At most, Dr. Babich testified that Dr. Siddiqui received the specialist's recommendation for a six-week follow-up, and he exercised his medical judgment by trying an alternative and more conservative course of care. While this *could* suggest a valid exercise of Dr. Siddiqui's reasonable medical judgment, it is also speculative. Dr. Babich does not describe how he knows that Dr. Siddiqui explicitly exercised judgment on this occasion, and Dr. Siddiqui does not explicitly address this either in the medical records or in his own affidavit.

collegial review process?  The answers to these questions are essential to assessing the adequacy and reasonableness of the care rendered for the chronic neck and cervical spinal problems, so summary judgment cannot be granted for Dr. Siddiqui concerning this condition.

Next, the Court considers Dr. Siddiqui's handling of the right shoulder tear.  Dr. Siddiqui was the first doctor to see Plaintiff at the prison about two weeks after he injured his shoulder in March of 2017, but at that visit, Dr. Siddiqui noted he did not yet have the hospital records.  On June 8, 2017, Dr. Siddiqui signed notes from a physical therapy evaluation for Plaintiff's right shoulder that another doctor ordered, which recommended that Plaintiff do the physical therapy exercises at least twice a week for a month, and that he sees the doctor in two months if he had not improved.  (Doc. 107-1 at 26-28).

On November 16, 2017, Plaintiff was seen by Dr. Siddiqui, and he reported ongoing shoulder pain that began in March of 2017.  Dr. Siddiqui noted that an x-ray of the shoulder was negative, but that Plaintiff's range of motion was restricted, so he recommended an MRI, which was approved in collegial review.  (Doc. 107-1 at 41, 58).  On January 23, 2018, Dr. Siddiqui referred Plaintiff to physical therapy for his shoulder while awaiting the report from the MRI.  (Doc. 107-1 at 47).  He noted on February 5, 2018, that he did not yet have the report.  (Doc. 107-1 at 48).  Finally, on March 27, 2018, Dr. Siddiqui noted that the MRI revealed a chronic tear and degenerative changes in the shoulder.  (Doc. 107-1 at 51, 67).  He also noted that Plaintiff had already been to physical therapy for the shoulder.  As such, he submitted Plaintiff to collegial review for an ortho

consult on his shoulder, which was approved. (Doc. 107-1 at 51-52, 69). On June 23, 2018, Dr. Siddiqui noted that Plaintiff had the ortho consult[12] and an injection in his right shoulder. (Doc. 107-1 at 53). After the injection and follow-up physical therapy, which Dr. Siddiqui reviewed in June of 2018, Plaintiff's medical records show very few mentions of right shoulder pain.

On the information available, the Court finds there is a genuine dispute about if delays to the diagnosis and treatment for Plaintiff's right shoulder condition are attributable to deliberate indifference by Dr. Siddiqui. After the initial injury, the hospital reports suggested that Plaintiff be seen back in two weeks if he was still in pain. This recommendation was not followed, though it is not clear if Dr. Siddiqui ever learned of this recommendation. Eventually on June 8, 2017, Dr. Siddiqui picked up on Dr. Coe's recommended course of physical therapy, and he signed a physical therapy evaluation that suggested Plaintiff try a month of therapy and see a doctor in two months if he was still in pain. (Doc. 107-1 at 26-28). Plaintiff ultimately did not receive further analysis of his shoulder until Dr. Siddiqui recommended him for an MRI in November of 2017, which was conducted in January of 2018. This means that Plaintiff potentially languished in pain from July to November of 2017.

There was then another delay from January to late March of 2018 when Dr. Siddiqui finally reviewed the MRI results and suggested an ortho consultation. Dr.

---

[12] Dr. Siddiqui's Motion for Summary Judgment exhibits did not include the report from the ortho consultation, but the IDOC Defendants' exhibits included the visit summary. (Doc. 102-3 at 234-238). The provider indicated that surgical and non-surgical options were discussed with Plaintiff, and that an injection was performed at the appointment. The provider recommended four weeks of physical therapy, and indicated Plaintiff should be seen again "as needed." (Doc. 102-3 at 238).

Babich testified that most reports come back from a specialist at most within three weeks, so it is not clear why it took nearly three months for the MRI to come back.  A jury could find that these delays left Plaintiff to suffer in prolonged pain.  Nothing in Dr. Siddiqui's affidavit addresses the intermittent nature of this care, other than his generic statement that the care he provided was appropriate.  (Siddiqui Aff., Doc. 107-2 at 7 ¶ 22).  As such, the Court will also deny summary judgment as to the handling of Plaintiff's right shoulder injury by Dr. Siddiqui.

Finally, the Court considers Dr. Siddiqui's handling of the low- and mid-back pain. When Dr. Siddiqui learned of Plaintiff's resurgence of low back pain, and when he learned of his mid-back pain, he initiated further treatment and diagnostic testing for these conditions.  Specifically, he had x-rays of the dorsal area done, and he had an MRI of the T-spine done.  In making these decisions, he also considered and mentioned the historical information including the 2016 MRI and injections.  These issues began to resurface in late-April of 2018 and by July of 2018, Plaintiff had x-rays, an MRI, and additional physical therapy.  Against this backdrop, Dr. Siddiqui acted reasonably in response to the low and mid-back issues, and summary judgment will be granted in his favor as to these two discrete conditions.

In sum, Plaintiff may proceed against Dr. Siddiqui concerning his handling of his right shoulder injury and his chronic neck or cervical spine pain, but not concerning his mid- or low-back pain.

### b. Dr. Coe

Dr. Coe treated Plaintiff on only two occasions—April 12, 2017, and June 6, 2017. (Coe Aff., Doc. 107-4 at ¶¶ 5-8).  He left employment with Wexford on June 17, 2017.  (Coe Aff., Doc. 107-4 at ¶ 3).  On the first occasion, Dr. Coe saw Plaintiff for reported shoulder pain.  Plaintiff had previously been to the hospital on March 6, 2017, and he had seen Dr. Siddiqui on March 23, 2017.  The hospital recommended a follow-up in two weeks if Plaintiff's pain had not subsided, but Dr. Siddiqui noted on March 23, 2017[13], that he did not have the hospital records, so he did not act other than to provide pain medication and Bengay rub.  (Doc. 107-1 at 13).  On April 12, 2017, it is not clear if Dr. Coe had access to the hospital records or not.[14]  Dr. Coe diagnosed Plaintiff with bursitis and recommended a physical therapy consultation and analgesic balm.  Plaintiff had the physical therapy consultation on May 16, 2017, at which time it was recommended he try a month of physical therapy, and if things did not improve in two months, he follow-up with a doctor.

On June 6, 2017, Dr. Coe noted that Plaintiff was in physical therapy, and he continued the analgesic balm for his shoulder.  (Doc. 107-1 at 19).  Dr. Coe added three prescription medications.  Dr. Coe also reviewed findings from Plaintiff's neurosurgery consult for his chronic neck problems and he submitted to collegial review that the specialist's recommendations be implemented.

---

[13] At this appointment, Dr. Siddiqui also addressed Plaintiff's chronic neck pain and referred him for a neurosurgery evaluation related to this condition.  (Doc. 107-1 at 13-14).

[14] Dr. Coe's affidavit reads as if he knew of the hospital records before or at the April 12, 2017, visit, but he does not acknowledge the hospital reports directly in the medical chart, so it remains unclear if he knew of the contents of the hospital reports.  (Doc. 107-4 at ¶ 5; Doc. 107-1 at 15).

Given that Dr. Coe's course of physical therapy for the shoulder had only been underway for a few weeks at the time of the June 6, 2017, visit, and that Dr. Coe departed employment at the facility approximately ten days after that visit, it cannot be said that Dr. Coe's actions amounted to deliberate indifference.  Plaintiff has not put forth any evidence that tends to suggest Dr. Coe's decisions were so far afield that they did not reflect sound medical judgment.  At most, it appears that perhaps Dr. Coe saw the hospital's recommendation for a follow-up if pain persisted, and he selected an alternative initial course of care that included topical balm and physical therapy.  When he saw Plaintiff a second time, the physical therapy recommendation had only been made about three weeks prior, and he continued the topical balm and added additional medications.  This course of initial care may not have revealed what ultimately turned out to be a torn rotator cuff, but it was a reasonable first course of action and it led-up to Dr. Coe's departure from the facility, which ceased his ability to control the care.  Dr. Coe's involvement in the chronic conditions other than the shoulder was so minimal that it cannot support a finding of deliberate indifference.  As such, the Court finds it appropriate to grant summary judgment in favor of Dr. Coe.

### c.  Dr. Caldwell

Defendants argue in the motion for summary judgment that although Plaintiff alleged in the complaint that he saw Dr. Caldwell on numerous occasions, the records do not actually reveal any appointment between the two.  Plaintiff does not directly answer this contention in his summary judgment response.  The Court independently notes that there is a medical note from March 18, 2018, that was included in the summary judgment

records of the IDOC Defendants that appears to be signed by Dr. Caldwell.  (Doc. 102-3 at 177).  The note indicates that Plaintiff was seen for back pain, which had been present for 30 days with the reported episode.  Dr. Caldwell noted that Plaintiff's vitals were stable, and that he had arthritis.  He prescribed Robaxin for 90 days, and indicated Plaintiff should follow-up as needed.

Given that the record contains evidence of only one visit between Dr. Caldwell and Plaintiff, that it was for a relatively new episode of back pain, and because Dr. Caldwell provided a medication in response to the reported pain, the Court finds that there is no basis to find deliberate indifference on behalf of Dr. Caldwell.  While this solution might not have mitigated all pain, or while it might not have matched Plaintiff's preferred course of treatment, there is insufficient evidence to find deliberate indifference.  The Motion for Summary Judgment (Doc. 106) will be granted on behalf of Dr. Caldwell.

### d.  Moldenhauer (nurse practitioner)

Defendant Moldenhauer first saw Plaintiff related to the allegations in this case on March 6, 2017, immediately after the fight that resulted in his right shoulder injury.  Moldenhauer deemed Plaintiff's injuries (a laceration to his head, and the shoulder injury) serious enough to warrant emergency care, and he directed that he be taken to the hospital.  Moldenhauer did not see Plaintiff again until May 3, 2017, at which time Dr. Coe had put him in for physical therapy for his shoulder, and he had been sent out to the specialist visit for his chronic neck and low back pain.  While the physical therapy played

out and while the prison awaited the specialist report from May 1, 2017, Moldenhauer gave a three -month prescription for Mobic.

Moldenhauer next saw Plaintiff on October 17, 2017, at which time he had been seen for the shoulder physical therapy, and he had the specialist's recommendations (injections and physical therapy) ongoing.  Specifically, on October 17, Plaintiff had just returned from his second injection for his neck and Moldenhauer recorded that he ambulated well and had "good sensation."  (Doc. 107-1 at 38).

On February 22, 2018, Moldenhauer saw Plaintiff for an evaluation, which he indicates in his affidavit was perhaps a follow-up for the January 2018 shoulder MRI and neurology appointment.  He indicated by affidavit that he did not yet have records from the MRI.  He noted that Plaintiff said he was supposed to have surgery the day prior, and he wrote in the records "i/m states "was supposed to have surgery yesterday" _____??  No report?? _____."  (Doc. 107-1 at 49).  He also noted back pain and he renewed Plaintiff's medications.   Plaintiff was scheduled for another follow-up.

On March 1, 2018, Moldenhauer saw Plaintiff again for chronic neck pain.  He noted Plaintiff had recently been started on Neurontin, and he had previously been evaluated by an outside facility.  He continued a variety of medications and muscle rubs and suggested physical therapy.   (Doc. 107-1 at 50).  He indicated by affidavit that Plaintiff's MRI results were still not back.

On May 11, 2018, Moldenhauer saw Plaintiff for the last time.  He noted that in the interim, the MRI results revealed a chronic tear to the shoulder, and that Dr. Siddiqui had already made an ortho consult referral, which occurred on April 18, 2018, but for which

no records had yet been received.  He also noted Plaintiff had a follow-up on May 1, 2018, with imaging of the low back.  The images were not yet available on May 11, 2018.  At that time, Plaintiff reported new pain in his mid-back, so Moldenhauer ordered a physical therapy assessment specific to that pain and he prescribed a month of Motrin.

On the whole, Moldenhauer's encounters with Plaintiff appear to be responsive to the medical conditions presented, and to the course of care that was ongoing.  However, there are two exceptions.  On February 22, 2018, and on March 1, 2018, Moldenhauer saw Plaintiff for complaints of ongoing chronic neck pain, and also for follow-ups on the shoulder MRI.  He indicated in his affidavit and in the records that he was aware Plaintiff had previously had outside visits for his neck condition, and he also indicated Plaintiff told him he believed he should have had surgery on February 21, 2018.  His notes appear to show confusion about this subject, and he indicated there was no record of any surgery. Despite learning of this oddity, there is no evidence that Moldenhauer took any action to investigate.  Had he done so, he might have come across Dr. Siddiqui's February 5, 2018, note that mentioned "scheduled for surgery c-spine stenosis" (Doc. 107-1 at 48), or he might have come across notes from the January 9, 2018, specialist visit which indicated a February 21, 2018, follow-up appointment with the neurology specialist (Doc. 107-1 at 62), or recommended a follow-up in six weeks (Doc. 107-1 at 66).  Rather than investigate Plaintiff's assertions or consider altering his course of care in light of reports that it was ineffective, Moldenhauer simply took the easy path and directed a continuation of the status quo.

Moldenhauer also knew that Plaintiff had an MRI of his shoulder on January 9, 2018, but that when he saw him on February 22 and March 1, 2018, the results had not yet been received.  He did not make any notation about what, if anything, he did to investigate this slow return time or to mitigate Plaintiff's pain in the interim.  Dr. Babich testified that at most, reports usually took three weeks to come back, so it is not clear from the records what was happening while Menard awaited the records.

Not every delay in treatment, or decision of one course of care over another, is enough to give rise to deliberate indifference, but here it appears that Moldenhauer may have knowingly left Plaintiff to suffer in pain for longer than might have been necessary. The record is far from clear on what actually occurred or what Moldenhauer knew at the February 22, March 1, or May 11, 2018, visits, but there is sufficient evidence to at least genuinely dispute whether Moldenhauer's actions contributed to prolonged harm.  As such, summary judgment will be granted on Moldenhauer's behalf in relation to the low/mid-back injuries, but it will be denied in relation to Moldenhauer's handling of Plaintiff's chronic neck pain and his right shoulder tear.  A reasonable jury could find that Moldenhauer was not diligent at the follow-up appointments in determining the specialists' recommendations and helping to implement care.

### e.  Dr. Ahmed

Dr. Ahmed saw Plaintiff just one time at Lawrence on October 29, 2018.  Dr. Ahmed left his employment at Lawrence one day later on October 30, 2018. (Ahmed Aff., Doc. 99-1 at 1 ¶ 2). At the single visit, Dr. Ahmed catalogued Plaintiff's history of chronic pain extensively, and he renewed his permits.  He noted that Plaintiff was not in acute

distress and that he was demanding a visit with a neurosurgeon.  Dr. Ahmed saw Plaintiff on this date as a follow-up from Sarah Stover's visit two weeks earlier, which had produced a recommendation for physical therapy that was ongoing.  Dr. Ahmed avers that Plaintiff reported the physical therapy was helping, and he believed that Plaintiff should continue that therapy and should be re-evaluated in two weeks.  He did not believe emergent surgical care was needed.  Based on these findings he put Plaintiff in for a follow-up two weeks later, which eventually occurred on November 13, 2018, with Sarah Stover.

Dr. Ahmed argues that the claim against him is best framed as one for a delay in treatment, not a denial, and that the delay was only 15 days at most (the time from his October 29, 2018, visit, until Stover's November 13, 2018 visit).  He argues that for a delay to rise to the level of a constitutional violation, Plaintiff must offer verifying medical evidence that the delay caused him harm.  While it is true that verifying evidence is expected in most cases with a claim of delayed treatment, the form of evidence sufficient to meet this standard varies.  Courts have concluded that a Plaintiff's own testimony and medical records can, in some instances, be enough to establish a material question about if a delay prolonged a plaintiff's suffering enough to amount to a violation of the Eighth Amendment.  *See e.g., Williams v. Liefer*, 491 F.3d 710 (7th Cir. 2007) (collecting cases on the proposition that a claim of delay must be accompanied by verifying evidence and finding that in that particular case a plaintiff's own testimony and medical records were sufficient to show that the delay prolonged his suffering); *Horne v. Brown*, 2020 WL 2526940 (S.D. Ill. May 18, 2020) (finding that a plaintiff's own testimony and his medical

records were enough to create a genuine dispute about if the delay prolonged his suffering).

Plaintiff counters that Dr. Ahmed should have exercised more diligence and should have more thoroughly investigated his situation when Plaintiff verbally reported at his appointment that he had a longstanding history of chronic neck pain and had been told by a specialist to return six weeks from January 9, 2018, but had yet to return. Plaintiff contends that instead of doing a diligent investigation into the situation, Dr. Ahmed merely turned a blind eye to his plight.

Ultimately, to counter a motion for summary judgment, a plaintiff must point to specific evidence in the record that supports his position. While case law suggests that a claim of delayed treatment can be supported by something less than an expert opinion by a medical provider, types of acceptable evidence typically include a plaintiff's testimony, coupled with other medical records. Here, neither Plaintiff's testimony nor his subsequent medical records clearly indicate that Dr. Ahmed's course of treatment left him to suffer helplessly in pain, or drastically slowed his course of care.

Plaintiff's testimony about his encounter with Dr. Ahmed was brief. He indicated that he did not remember the interaction with Dr. Ahmed well, but that he believed Dr. Ahmed knew he had upcoming physical therapy for his back condition, that Dr. Ahmed reviewed his medical records during the appointment, that he told him to lose weight, and that he put him in for a follow-up appointment in two weeks. (Gill Dep., Doc. 113-7 at 15-16, 56:58:1). Plaintiff testified that he believed he should have had an immediate surgical consultation for his ongoing chronic pain, and he sued Dr. Ahmed because he

felt as a doctor he did not provide an appropriate response to his report of chronic pain. (*Id.* at 16, 61:5-18).

Inmates are not entitled to demand specific care, and Dr. Ahmed averred that he did not think it was medically necessary to submit Plaintiff for an immediate surgical consultation. Dr. Ahmed also reports, and Plaintiff agreed at his deposition, that Plaintiff had been submitted for physical therapy for his back at the time the two met for this single visit. (Ahmed Aff., Doc. 99-1 at ¶ 22; Gill Dep., Doc. 113-7 at 16, 58:18-20). While Plaintiff wished to skip the therapy and to proceed right to the specialist, his preference does not establish that Dr. Ahmed's decisions amounted to deliberate indifference. Additionally, Dr. Ahmed scheduled Plaintiff for a follow-up just two weeks later, at which time Plaintiff was referred for the specialist consultation he desired. Against this backdrop, Plaintiff has provided insufficient evidence to counter Dr. Ahmed's motion for summary judgment or to create a genuine dispute about the adequacy of the care he provided. Dr. Ahmed's Motion for Summary Judgment (Doc. 98) will be granted in full.

### f. Dr. Pittman

Although Plaintiff arrived at Lawrence in October of 2018, Dr. Pittman did not begin employment there until February 1, 2019. (Pittman Aff., Doc. 105-2 at 1 ¶ 2). Dr. Pittman immediately referred Plaintiff for a neurosurgery consultation and a pre-requisite MRI on February 8, 2019, and both were approved within a week. Dr. Pittman first saw Plaintiff on February 20, 2019, at which time the follow-up specialist care had been approved. She renewed his low bunk permit and told him to return in four weeks. Dr. Pittman did not actually see Plaintiff again until May 2, 2019. By this time, he had

received the follow-up MRI of his cervical spine, and the results had been faxed to the specialist for review. Dr. Pittman also reviewed the MRI for the May 2, 2019, appointment and noted that it revealed degenerative disc disease and mild spinal stenosis. (Pittman Aff., Doc. 105-2 at ¶ 10). She believed these issues were treatable, but not curable. She performed manipulative treatment during the appointment, ordered that his medications be continued and told him to return in four weeks. She believed surgery would be unnecessary unless the specialist reported otherwise.

The medical staff followed-up with the specialist on June 5, 2019, but got no response. From June 19-July 3, 2019, Plaintiff was gone on a writ to Stateville. On July 10, 2019, he transferred to a new facility.

Dr. Pittman acted quickly on Plaintiff's medical file when she began in February of 2019, by putting him in for a follow-up MRI and specialist visit. However, ultimately only half of this recommended care was completed from February to July of 2019 when he was transferred to a new facility. Plaintiff received the MRI, and Dr. Pittman indicated she did not believe that it warranted surgical intervention, but she never actually secured the follow-up specialist visit, or the specialist's opinion. The MRI results were sent to the specialist on April 18, 2019, and only one follow-up contact with that office was made in June of 2019.

In the interim, Dr. Pittman attempted an osteopathic maneuver at the May 2019 appointment, and continued Plaintiff's medications. Ultimately, when Plaintiff was seen by the specialist, they recommended additional injections and suggested a different medication, but said surgery was not recommended. The question as to Dr. Pittman is,

did she knowingly persist with a course of care that was ineffective, or did she unreasonably delay a return to the specialist for a follow-up opinion?  And if she knowingly persisted in ineffective care or delays, did her actions cause prolonged suffering and were her actions beyond the bounds of reasonable medical care?  As with Dr. Siddiqui, these are questions to be resolved by a jury.  The Court cannot determine on the evidence presented if Dr. Pittman's actions were or were not within the bounds of reasonable medical judgment.  Accordingly, the Motion for Summary Judgment (Doc. 104) is denied as to Dr. Pittman's handling of Plaintiff's chronic neck and back issues.

### g.  S. Stover (nurse practitioner)

Defendant Stover contends that she had just four visits with Plaintiff, and that during their first visit on November 13, 2018, she immediately made a referral for the neurosurgery follow-up that she believed had perhaps erroneously not been scheduled while Plaintiff was at Menard.  (Stover Aff., Doc. 105-3 at ¶ 6).  On November 13, 2018, Stover wrote a medical services referral form wherein she indicated Plaintiff "has seen neurosurgery in the past and was supposed to have a follow up. According to chart, MD from Menard ordered follow up but possibly did not do collegial paper." (Doc. 105-1 at 39).

Stover's contention that she first learned of Plaintiff's issues on November 13, 2018, is contradicted by Dr. Ahmed's affidavit and supporting evidence, which show that during a hypertension clinic visit on October 12, 2023, she noted Plaintiff had "severe spinal stenosis bulging discs." (Ahmed Aff., Doc. 99-1 at 2 ¶ 10); (Doc. 99-1 at 71).  In the October 12, 2018, notes, Stover indicated Plaintiff should have physical therapy to

evaluate and treat his situation and he should follow-up in two weeks for his back pain. (Doc. 99-1 at 71).  Plaintiff was seen for a physical therapy evaluation on October 24, 2018, and that evaluation included recommendations for his neck.  (Doc. 102-4 at 38-39). Against this backdrop, Stover seemingly knew of Plaintiff's chronic pain earlier than she lets on in her affidavit.

In any event, Stover's initial referral for a neurosurgery follow-up was rejected by Wexford in favor of an alternative treatment plan with six weeks of physical therapy. (Doc. 105-1 at 41).  This recommendation was premised on a finding Plaintiff had not previously done physical therapy for his neck, which appears inaccurate.  There are physical therapy notes in Plaintiff's charts that indicate he had physical therapy for his neck, including traction, at Menard.  For example, on March 16, 2018, he said cervical traction did not provide relief, but he repeated it for at least 15 minutes at therapy.  (Doc. 102-3 at 177).  In March and April of 2018, he had additional appointments with traction (Doc. 102-3 at 178, 180, 183-84).

Records also suggest that Plaintiff began physical therapy for his neck again in October of 2018 at Stover's direction prior to the denial of her referral for a neurosurgery follow-up.  (Doc. 102-3 at 187) (notes indicate physical therapy started for neck pain and included a hot pack and neck strengthening exercises); (Doc. 102-4 at 40-41) (physical therapy notes regarding neck and low back pain from October 26, 2018).  In fact, Plaintiff had appointments for physical therapy on October 26, 29, November 1, 13, 15, 26, 29 and December 3, 10, and 13, 2018.  (Doc. 102-4 at 40-43, 48-49, 53-56, 59-64, 66-69).  On November 27, 2018, Wexford denied the request for the neurosurgery follow-up in

collegial review because Plaintiff was "in physical therapy for his low back pain but not for his neck pain.  Recommended to complete physical therapy for the cervical spine to include traction if possible, follow up in 6 weeks to reassess if any surgical[.]"  (Doc. 102-4 at 71).

Against this backdrop, it is not clear why Wexford believed that Plaintiff had never completed physical therapy for his neck.  There is no indication in the records that Stover asked for reconsideration of the denial of the neurosurgery referral.  By the time the denial was made, Plaintiff had already completed four weeks of physical therapy at Lawrence.  Additionally, Stover saw Plaintiff again on December 27, 2018, at which time he *had*  completed the six weeks of neck specific physical therapy, and at that time she did not renew the referral for a neurosurgeon consultation.  At that appointment, Plaintiff made her aware that he continued to suffer in pain and that his medications helped but did not last the whole day, and while aware of his ongoing pain she opted to simply tell him to continue on multiple medications and to follow-up again in eight weeks.  (Doc. 111-2 at 71).

Stover argues that when she saw Plaintiff on December 27, Plaintiff had "already been approved for an alternative treatment plan of six weeks of physical therapy," (Doc. 105 at 13), and she knew he had medications targeted at his conditions.  These contentions ultimately do not work in Stover's favor when viewed in context with the information recited above.  It appears that as early as October of 2018, Stover knew Plaintiff might have a need for an outside specialist referral, and that although she ultimately learned that to be true and recommended a specialist visit, she did not then appeal that denial, or

renew her request for approval later when physical therapy was completed.  Instead, Stover continued Plaintiff on pre-existing medications and therapy, which he informed her were not addressing his pain adequately.  This forced Plaintiff to wait until Dr. Pittman stepped in and directed further follow-ups in February of 2019.

On these facts there is a genuine dispute about if Stover delayed or denied Plaintiff adequate care for his chronic pain.  The records support a finding that Stover might have known that specialists had recommended Plaintiff be seen for a follow-up as early as January of 2018 (or six weeks thereafter)[15] and that as a result of her personal handling of this recommendation, Plaintiff was not ultimately re-approved for the specialist follow-up until February of 2019.  The follow-up imaging did not ultimately occur until March, and Plaintiff was never seen by the specialist during his entire stay at Lawrence.

Plaintiff had two subsequent visits with Stover, one about a fight, and one about if his housing location could be moved closer to the medical unit, but neither of these events appear closely related to the deliberate indifference for chronic conditions that make up the heart of this lawsuit, and the Court does not find any reason that allegations related to these visits should proceed.

Based on the analysis about Stover's interactions with Plaintiff, the Court will deny Stover's Motion for Summary Judgment (Doc. 105) because there is a genuine dispute about whether her course of actions in November and December of 2018 either amounted

---

[15] Stover wrote in the neurosurgery specialist referral that Plaintiff had "seen neurosurgery in the past and was supposed to have a follow up.  According to chart, MD from Menard ordered follow-up but possibly did not do collegial paper."  (Doc. 105-1 at 39).

to a denial of adequate care or a delay of the follow-up specialist visit that prolonged Plaintiff's suffering.

### h. Wexford Health Sources, Inc.

Plaintiff was allowed to proceed against Wexford on his contentions related to both Menard and Lawrence. Wexford participated in the motions for summary judgment filed by Drs. Siddiqui, Caldwell, Coe, and Pittman. (Docs. 104, 106). In both instances, Wexford contended that any claim against them that they denied specialist referrals or hindered care is unsupported by the record. (Docs. 105 at 17, 107 at 18).

Plaintiff's specific allegations against Wexford in his complaint were that the doctors he saw at the prisons repeatedly told him they could not or would not refer him to a specialist because Wexford would not approve it. He also alleged that Wexford had a policy of denying adequate medical care in order to cut costs. In response to the motions for summary judgment, Plaintiff argues that it is "clear that the widespread custom and practice of Wexford through their providers is to provide only minimal treatment to inmates like Mr. Gill and to delay the approval and referral for outside specialists." (Doc. 111 at 17; Doc. 113 at 17-18). Plaintiff also argues in response to summary judgment that Wexford was responsible for understaffing the prisons, which also led to inadequate care.

Because Wexford acts under color of state law by contracting to provide medical care to correctional facilities, it is treated as a government entity for purposes of § 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n. 6 (7th Cir. 2002). As a result, Wexford cannot be held liable for damages under a theory of respondeat superior for constitutional violations and can only be held liable under § 1983 for unconstitutional

policies or widespread practices that cause a constitutional injury. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017). To establish *Monell* liability, a plaintiff must prove the existence an actual policy or custom; that the policy or custom caused the constitutional injury, meaning the custom or policy was the "moving force" behind the injury; and that policymakers were deliberately indifferent to the known or obvious risk that the policy would lead to constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

To the extent that Plaintiff now presents a new factual theory about understaffing, the Court will not consider this as a basis to deny summary judgment because this factual theory or related allegations were not made at any time earlier in the litigation. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) ("When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories the plaintiff has pursued so far.").

As to Plaintiff's contentions that Wexford repeatedly refused to approve specialist visits, any such theory is plainly refuted by the record evidence submitted by the Defendants which shows that nearly every single referral for specialized treatment or diagnostic imaging was approved. The only exception the Court detected was Wexford's initial denial of Sarah Stover's referral to a neurosurgeon on November 27, 2018. (Doc. 105-1 at 41). In this refusal, Wexford recommended an alternative treatment plan of physical therapy for the cervical spine with traction, and a follow-up in six weeks to reassess the need for a surgical consultation. While the Court indicated in the analysis

above concerning Defendant Stover that this denial was perplexing because Plaintiff had in fact participated in neck specific physical therapy, this single instance of a refusal is not sufficient evidence of a harmful policy, custom or practice by Wexford.

To the extent that Plaintiff argues that Wexford favors cost over quality care, and provides only minimal care to save money, no evidence has been developed that such a policy exists or caused harm in his case.  Plaintiff appears to have run into roadblocks getting care because he at times got stuck in a loop at the prison where the doctors or nurse practitioners may have continued to send him for redundant care or may have failed to make referrals to Wexford for follow-up care, but all of this amounts to potential errors or wrongdoing of the individual employees and not Wexford itself.  Plaintiff also has not developed any evidence of similar experiences for other inmates with chronic pain, and *Monell* claims that rest solely on a plaintiff's individualized experience are routinely rejected as insufficient.  *See e.g., Dean v. Wexford*, 18 F.4th 214, 240 (7th Cir. 2021) ("While we are sympathetic to Dean's experience, his only substantive proof relates to delays in care that he himself experienced.  He has not proven a pattern of similar constitutional violations or a patently obvious risk of such violations.").

Based on the available evidence, summary judgment will be granted in favor of Wexford and the case will not proceed against Wexford on Claims 1 or 2.  This resolves all claims in this case against Wexford.

### iii.    The Wardens (Lashbrook, Brookhart, Kink)

Finally, the Court is left to consider if there are genuine disputes of fact about Plaintiff's allegation that Warden Lashbrook (Menard) and Wardens Kink and Brookhart

(Lawrence) turned a blind eye to his plight despite his correspondence to them seeking their assistance in securing needed medical care.  The outcome as to the Wardens is split. The Court will deny summary judgment on behalf of Wardens Lashbrook and Brookhart, but it will grant summary judgment on behalf of Warden Kink.

Prison administrators are allowed to delegate tasks to subordinates, and they cannot be held liable purely on the basis that they have a general duty to oversee the prison facility.  *See e.g., Perez v. Fenoglio,* 792 F.3d 768, 782 (7th Cir. 2015).  However, a prison administrator may be held accountable if they turn a blind eye to a serious risk to an inmate when they are notified that there is a present risk of harm and that subordinates are contributing to that risk.  *See e.g., Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (nonmedical officials can be liable for deliberate indifference if they review an inmate's highly detailed grievances or correspondence  and have a reason to believe prison doctors or assistants are mistreating or not treating a prisoner); *Sims v. Scanlon*, 2023 WL 4028984 at *8-9 (S.D. Ind. June 15, 2023) (denying summary judgment on behalf of a warden who received written communications about contaminated water in an inmate's cell, but had no evidence about what he did in response to this complaint other than contacting maintenance staff).  Evidence sufficient to create a genuine dispute of fact about an administrator's role in deliberate indifference to an inmate's need may include verbal or written correspondence or numerous detailed grievances.  *See e.g., Taylor v. Wexford Health Sources, Inc.*, 2022 WL 4329025 at *17 (N.D. Ill. Sept. 19, 2022) (finding that Plaintiff's numerous grievances, letters, and his own testimony about contacting wardens

regarding his need for medical care was sufficient to create a triable issue about the potential deliberate indifference of two IDOC wardens to a serious medical need).

The wardens contend at a high-level of generality that they cannot be held liable for issues with Plaintiff's healthcare because as administrative staff they are entitled to defer to the medical professionals for treatment decisions, and Plaintiff had treatment that was ongoing at all times, including multiple rounds of imaging, specialist visits and physical therapy. (Doc. 102). Plaintiff counters that he contacted each warden numerous times for assistance because there were inexplicable delays and roadblocks throughout his course of treatment. Plaintiff supported his contentions with copies of grievances, letters, and his own testimony.

Wardens Lashbrook and Brookhart were deposed, and both stated they had no specific recollection of receiving communications from Plaintiff in the form of grievances or letters, though they acknowledged that in the ordinary course of their roles they easily could have received such documents. Warden Kink submitted via interrogatory response that he was not aware Plaintiff had requested to be seen by an outside medical specialist. (Doc. 102-8 at 8). He also indicated that decisions regarding specialist visits were made my medical personnel. (Doc. 102-8 at 9). Plaintiff testified that the letters he transmitted to each warden were all submitted via the prison's internal mail procedures, and he believed that by using this system, his correspondence would make it to the intended recipient. (Gill Dep., Doc. 112-7 at 20:15-21:24). Each warden will be analyzed in-turn.

41

Beginning with Warden Lashbrook, the Court finds that Plaintiff has sufficient evidence to create a genuine dispute of material fact about Warden Lashbrook's handling of his medical needs.   One discrete example of Plaintiff clearly notifying Warden Lashbrook of his need for care took place in a series of exchanges in early 2018.   On February 6, 2018, Plaintiff submitted an emergency grievance wherein he alleged he had been seen at outside providers for chronic neck problems and also for an MRI for his shoulder injury, but nearly a month after these visits he had yet to receive any follow-up with local medical staff such as Dr. Siddiqui.  (Doc. 102-5 at 10).   Warden Lashbrook denied this grievance emergency status,[16] and it was then processed in the ordinary course.  A March 13, 2018, memo from the medical unit to the grievance officer confirmed that Plaintiff had not yet been seen to review his MRI results and that the prison had just requested the records from that visit.   (Doc. 102-5 at 12).   The grievance officer inexplicably did not rule on this grievance until July 6, 2018, at which time she concluded that the issues had been addressed because Dr. Siddiqui reviewed the MRI results on March 27, 2018.  (Doc. 102-5 at 9).   Warden Lashbrook then concurred in the finding that the inmate's grievance was moot because he had been seen for the results of the visits on his neck and shoulder.  (Doc. 102-3 at 9).

Not only does this series of events ultimately ignore Plaintiff's concerns about follow-up care for his neck issues (the substantive contents of the grievance responses go

---

[16] Lashbrook testified at her deposition that assistant wardens also had signature authority on her behalf, and that if they exercised that authority the signature would bear initials. (Lashbrook Dep., Doc. 112-5 at 7:10-12).  The signatures on this February 2018 grievance and the July grievance office response do bear initials.  (Doc. 102-5 at 9-11).

only to the MRI for the shoulder), but it also allowed his request for a follow-up on the right shoulder MRI results to languish for multiple months. That MRI ultimately revealed a torn rotator cuff, for which he received an injection in April of 2018. Against this backdrop, it cannot definitively be said that Warden Lashbrook (or her designees) or the medical providers reasonably investigated or resolved Plaintiff's concerns. There is a genuine dispute about if Warden Lashbrook was responsive to Plaintiff's plight, or if she turned a blind eye.

In addition to the February 2018 grievance, the record also includes a letter that Plaintiff wrote to Warden Lashbrook about his need for follow-up care for his neck. (Doc. 112-4 at 1). There is no indication that Lashbrook responded, but she admitted at her deposition she may have received correspondence of this nature. (Lashbrook Dep., Doc. 112-5 at 2:24-3:3; 6:20-24). Lashbrook testified that if she got a letter about medical care she might first check to see if an offender was utilizing the grievance process for the issue, but she may also personally contact or visit the healthcare unit to review the offender's medical files and needs with medical staff. Plaintiff sent a subsequent letter to Lashbrook on August 3, 2018, at which time he again asked for adequate follow-up care. (Doc. 112-4 at 2). The letters that Plaintiff alleges he sent to Lashbrook, and her testimony about possible responses to offender letters about healthcare, bolster the notion that there *could* be a finding Lashbrook turned a blind eye to Plaintiff's plight, so this dispute must be resolved by a jury.

As to Warden Kink, on November 28, 2018, Plaintiff filed a grievance wherein he explained he had constant severe pain in his neck and back and that he asked Dr. Ahmed

and Stover for a specialist visit and for treatment.  (Doc. 102-5 at 55).  On November 28, 2018, the counselor indicated that Plaintiff had been approved for a consult with a neurosurgeon and that scheduling was in progress.  On December 17, 2018, the grievance officer indicated again that as of that date the medical records supervisor reported that scheduling with neurosurgery was in process.  (Doc. 102-5 at 54).  Warden Kink concurred in the finding that the grievance was moot.  On November 29, 2018, Plaintiff alleges he also wrote a letter to Warden Kink seeking a referral to a specialist for his neck and back.  (Doc. 112-4 at 3).

Unlike Warden Lashbrook, who received multiple letters and numerous grievances about Plaintiff's condition, it appears that Warden Kink received just one letter and one (or possibly a few) grievances.  At the time that Kink got the November grievance and letter, Plaintiff had just seen Stover and she had just submitted a referral to Wexford's collegial review process for a neurosurgeon consultation.  She had also previously provided physical therapy and medications.  Thus, had Warden Kink received this particular correspondence, and had he inquired with the medical staff about what was happening, he would have been informed that at that time the medical unit was actively managing Plaintiff's needs for care.  By January of 2019, Defendant Brookhart became Warden at Lawrence, and thus Kink's involvement ended.  On this very limited time of potential interactions, the Court does not find it plausible that Warden Kink exhibited deliberate indifference towards Plaintiff's needs, so summary judgment will be granted in Warden Kink's favor.

Finally, as to Warden Brookhart, the Court finds there is a genuine dispute of fact about Brookhart's potential deliberate indifference towards Plaintiff's ongoing medical needs.   In April of 2019, Plaintiff filed a grievance at Lawrence indicating that he continued to seek treatment for severe neck and back pain to no avail.   Specifically, he indicated his call passes had been repeatedly cancelled for over a month, despite being told by Stover that he needed to see a doctor to review his recent MRI results for his neck. (Doc. 112-3 at 49-50).   The grievance officer conferred with the healthcare unit and reported that Plaintiff was seen by a doctor and was treated 'within community standards' on May 2, 2019, so the grievance was denied as moot.  (Doc. 11-23 at 48).  The Warden at that time concurred.

Plaintiff also tendered two letters he alleges he sent to Brookhart on March 7, 2019 and June 6, 2019.  (Doc. 112-4 at 5-6).  In the first letter he alleged he had severe neck, back, and shoulder pain and that his appointments to see a specialist were repeatedly denied by Wexford.  He claimed he needed surgery, and the physical therapy he was offered only made things worse.  (Doc. 112-4 at 5).  In the second letter, Plaintiff alleged he was writing to follow-up on a face-to-face conversation during segregation rounds. He again claimed he needed to see a neck specialist because his pain was ongoing, and Wexford continued to deny the needed care.  (Doc. 112-4 at 6).

Warden Brookhart testified that if she received a letter about a medical issue from an offender, she would forward it to the healthcare unit administrator to be addressed. (Brookhart Dep., Doc. 112-5 at 19:18-19).  She had no recollection of receiving either of the letters provided by Plaintiff.  (Brookhart Dep., Doc. 112-5 at 19:2-7).  She also testified that

it was her routine practice to deem emergency grievances about medical issues emergent so that they could be directed to the medical professionals for processing. (Brookhart Dep., Doc. 112-5 at 20:10-16). Brookhart testified that she did not have authority to refer offenders to see a specialist or to have a surgical procedure. (Doc. 112-5 at 23:6, 10).

There is a genuine dispute as to Warden Brookhart because Plaintiff testified that he spoke to her and sent her two letters about his needs, and she does not explicitly deny that this correspondence might have taken place. Though it would have been her routine practice to simply re-route correspondence of this nature back to the medical staff, there is no evidence that Warden Brookhart actually did so in this case and even if she did, blind deference may not be sufficient to escape liability. Here, in the context of Plaintiff's claims, if the evidence is interpreted broadly in his favor, he repeatedly informed Warden Brookhart that he was unable to secure adequate care from the medical staff and that they left him to languish in pain. Re-routing this complaint about subordinates back to the individuals who are allegedly underperforming may not, in a jury's view, be a sufficient investigation into the situation. *See e.g., Taylor v. Wexford Health Sources, Inc.*, 2022 WL 4329025 at *16-17 (N.D. Ill. Sept. 19, 2022) ("wardens cannot defend themselves at summary judgment by claiming 'deference to medical professionals' when there is no evidence in the record that they exercised such deference.") Accordingly, the Motion for Summary Judgment (Doc. 101) is denied as to Warden Brookhart.

## DISPOSITION

In sum, Defendant Ahmed's Motion for Summary Judgment (**Doc. 98**) is **GRANTED**, and this resolves all claims against Dr. Ahmed so judgment will be entered in his favor at the close of the case.

The IDOC Defendants' Motion for Summary Judgment (**Doc. 101**) is **GRANTED** as to Warden Kink, and **DENIED** as to Wardens Lashbrook and Brookhart.

Dr. Pittman and Sarah Stover's Motion for Summary Judgment (**Doc. 104**) is **DENIED** in part as it pertains to Dr. Pittman and Stover, but it is **GRANTED** in part as it pertains to Wexford Health Sources, Inc..

The Motion for Summary Judgment (**Doc. 106**) of the remaining Wexford Defendants is **GRANTED** as it pertains to Drs. Coe and Caldwell, and as to Dr. Siddiqui and Moldenhauer as to mid- and low-back pain.  It is also **GRANTED** in part as to Wexford Health Sources, Inc..  By contrast, it is **DENIED** in part as to Dr. Siddiqui and Moldenhauer in relation to their handling of Plaintiff's shoulder tear and his chronic neck pain.

**Claim 1** shall proceed against Defendants Dr. Siddiqui, Moldenhauer and Lashbrook concerning Plaintiff's shoulder tear and neck pain, and **Claim 2** shall proceed against Defendants Dr. Pittman, Stover, and Brookhart concerning Plaintiff's chronic neck pain.

Defendants Moldenhauer (Doc. 107-3), Stover (Doc. 105-3), and Drs. Siddiqui (Doc. 107-2), Coe (Doc. 107-4), and Pittman (Doc. 105-2) all submitted unsigned affidavits

in support of summary judgment.  Defendants are DIRECTED to file signed copies as an exhibit within 7 days.

**IT IS SO ORDERED.**

Dated: February 21, 2024                                      /s *David W. Dugan*

_____

DAVID W. DUGAN
United States District Judge